IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

KEITH NAHIGIAN, *et al.*,        )
                                 )
                                 )
     Plaintiffs,                 )
                                 )
        v.                       )
                                 )        1:09cv725 (JCC)
JUNO-LOUDON, LLC., *et al.*,      )
                                 )
     Defendants.                 )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Motions for Summary
Judgment filed by defendant Ritz-Carlton Hotel Company, LLC
("Ritz") and defendant Juno-Loudon, LLC. ("Juno") (collectively,
the "Defendants"), and a Motion for Partial Summary Judgment
filed by plaintiffs Keith and Courtney Nahigian (the "Nahigians"
or "Plaintiffs"). For the following reasons, the Court grants in
part and denies in part Plaintiffs' Motion for Summary Judgment,
grants Ritz's Motion for Summary Judgment, and grants in part
and denies in part Juno's Motion for Summary Judgment.

### I. Background

The following facts are not in dispute.

### A.    Relationship between Juno and Ritz

On June 11, 2004, Juno, a Florida limited liability
company, entered an Amended and Restated Transaction Agreement

("Initial Agreement") with Ritz, a Delaware Corporation, which outlined a plan for developing luxury golf course communities. (*See* Nahigian's Statement of Uncontested Material Facts in Support of Summary Judgment ("Plaintiffs' Facts") [Dkt. 131] P. Ex. A).[1]  On May 26, 2005, Juno and Ritz entered into three additional agreements: a Transaction Agreement, an Operating Agreement, and a Technical Services Agreement.  *Id.*

The Transaction Agreement concerned the development of certain real property located in Loudoun County, Virginia that would become the Creighton Farms development ("Development"). (Ritz's Mem. in Supp. of its Mot. for Summ. J. ("Ritz's Mem.") R. Ex. 1 (Transaction Agreement), Recital A, at 1.)  It approved the Development as a "project" within the meaning of the Initial Agreement.  (J. Ex. G, Recital D and E.)  It also contemplated Ritz entering into other agreements with Juno, "[e]ither simultaneous with the execution of this Agreement, or subsequent thereto," including, but not limited to, a golf club operating agreement, a technical services agreement and a property management agreement for the project.  (R. Ex. 1, Recital F, at 1-2.)

The Operating Agreement ("Operating Agreement") covered the management of the golf course and recreational amenities at the Development.  (Juno's Memorandum in Support of

---

[1] The Plaintiffs' exhibits will be referenced "P. Ex."; Ritz's exhibits will be referenced "R. Ex." and Juno's exhibits will be referenced "J. Ex."

its Summary Judgment Motion ("Juno's Mem.") J. Ex Z (Operating Agreement) at 2; P. Ex. C.) The Operating Agreement had an initial operating term of 20 full fiscal years from the opening date of the golf course, golf practice area, and temporary golf shop, with three 10-year extensions thereafter. (J. Ex. Z at ¶¶ 3.1 and 3.2.) The Technical Services Agreement provided for the design and construction of a golf course and clubhouse at the Development. (*See* Juno's Mem. ¶ 7; Plaintiffs' Facts ¶ 7.)

Despite these agreements, Juno retained title to the land at the Development. (R. Ex. 2 at 40:18-20.) Ritz had no ownership interest in any Juno entity related to the Development and was only one of several mezzanine lenders to the project. (R. Ex. 2. at 38:03-38:18.) Juno was the exclusive seller of residential lots within the Development. (*See* Plaintiffs' Facts ¶¶ 28-29; R. Ex. 2 at 40:18-20.) According to the Transaction Agreement, the residences at the Development were "not to be sold under the Ritz-Carlton brand." (R. Ex. 1 at 1.) Under this arrangement, Ritz was not expected to engage in residential lot sales. (R. Ex. 2 at 33:22-34:04.) Nevertheless, Juno was authorized to use Ritz trademarks in Juno's marketing and sales materials with Ritz's prior written consent. (R. Ex. 2 at 41:07-41:11; P. Ex. B § 4.17.) The Transaction Agreement restricted Juno's use of the Ritz brand in its advertising of the Development, for example by requiring the use of a

3

disclaimer in Juno's advertising stating that the Development "[was] not owned, developed or sold by the Ritz-Carlton Hotel Company, LLC." (R. Ex. 2 at 42:03–42:11; P. Ex. G).[2] In exchange for authorized use of its trademarks, and for other consideration, Ritz was entitled to a 5.5% fee of the gross sale price from the sale of each lot at the Development pursuant to the Transaction Agreement. (P. Ex. B § 3.1(A).)

On June 16, 2006, the Virginia State Corporation Commission issued a certificate of incorporation to The Estates at Creighton Farms Property Owners' Association, Inc. (the "HOA"). (J. Ex. AA at JL1-01661.) On October 19, 2006, a "Master Declaration of Conditions, Easements, and Restrictions for The Ritz-Carlton Golf Club and The Estates of Creighton Farms" (the "Master Declaration") was recorded in the land records of Loudoun County, Virginia. (J. Ex. AA at JL1-01590.) Juno was the "Declarant" in this declaration and was identified as the "owner" of the property subject to the Declaration. (J. Ex. AA at JL1-01595.) According to the Master Declaration, the HOA would be responsible for the maintenance of all common property and other services, including maintenance of landscaping and for security monitoring of the common property. (J. Ex. AA at JL1-01604 to JL1-01606, JL1-01608.) The Master

---

[2] Juno was not authorized to convey that Ritz was selling the land at Creighton Farms. (R. Ex. 2 at 41:15 – 41:17.) Juno engaged in no such advertising. (R. Ex. 2 at 41:18 – 41:20.)

Declaration provided that the HOA could contract out some or all of the services provided for in the Master Declaration and that "it is anticipated that the Master Association will enter into a management contract with Ritz-Carlton Hotel Company, LLC." (J. Ex. AA at JL1-01609.)

As of June 2007 (when the Plaintiffs agreed to purchase the disputed property) no residents were living at the Development. (R. Ex. 2 at 24:02-24:04; R. Ex. 5 (Keith Nahigian Dep.) at 91:17-91:21.) The golf course was not scheduled to open until April 1, 2008. (R. Ex. 3 at 91:22-92:9.) Indeed, no residents moved into the development during the entire time of Ritz's involvement with the property. (See R. Ex. 6 at 77:04-14 (no residents as of March 2008); J. Ex. H at 2, ¶ 4.) Additionally, as of June 2007, Juno and Ritz had not entered into an HOA management agreement for the Development because "[i]t was anticipated to be executed at a point when the property had residents living there." (R. Ex. 2 at 23:16-24:01.) Despite the absence of this agreement, as of June 2007, Ritz was providing some services which would have been performed pursuant to such a management agreement, including landscaping along the roads of the Development and providing security for the gates.[3] (R. Ex. 2 at 24:05-22; R. Ex. 3 at 17:04-18.) As of

---

[3] There was not a Ritz Kids daycare program, as there were no children living at the community. (R. Ex. 6 at 86:19-86:22.) In 2008 and 2009, the Nahigians were given access to a reciprocal Hotel Reservation Service by

October 17, 2008, it was still contemplated that a property management agreement would be executed in conjunction with a recapitalization of the Development and that a draft agreement with a management term of 30 years would be prepared. (J. Ex. L; J. Ex. K ¶ 3.1.)

> **B.** **Plaintiffs' Discovery, Investigation and Purchase of Property in the Development**

Between 2006 and 2008, the lots at the Development were marketed to the public using interstate media. (*See* P. Ex. G.) Some of Juno's advertisements marketed Creighton Farms as a "Ritz-Carlton Managed Community." (*See* P. Ex. G.) While a property management agreement between Juno and Ritz was anticipated by the Defendants, at the time of the marketing there was no HOA agreement between Juno and Ritz for managing the residential community at Creighton Farms. (*See* P. Ex. M at 53:2-4; J. Ex. C. at 23-24.) The parties never entered into an agreement for managing the residential community at Creighton Farms. (See Exhibit M at 53:2-4.)

Nevertheless, several advertisements for the Development from that time (2006-2007) specifically displayed the Ritz trademark immediately above the words "A Ritz-Carlton Managed community." (*See* P. Ex. G.) This Ritz trademark was only to be used with Ritz's permission and approval. (R. Ex. 2

Ritz-Carlton providing them discounted rates, upgrades, and other benefits at participating Ritz-Carlton hotels. (R. Ex. 7 at 1000231-1000237.)

at 41:07–41:11; P. Ex. B § 4.17; P. Ex. M. at 58:6-11.)  Among these advertisements was a brochure received by Mr. Nahigian before he purchased his property.  (R. Ex. 5 at 241:05-241:14.) The brochure contained several Ritz trademarks, and also referenced the Development as a "Ritz-Carlton managed community."  (R. Ex. 16.)  The brochure reviewed by Mr. Nahigian also contained the following disclosure:

> Creighton Farms is not owned, developed or sold by The Ritz-Carlton Hotel Company, LLC. Juno Loudoun, L.L.C. uses the Ritz-Carlton marks under license from The Ritz-Carlton Hotel Company, L.L.C. Juno Loudoun, LLC is the owner and developer of the project. Developer will enter into an agreement with The Ritz-Carlton Hotel Company (R-CHC) or an affiliate for the management of the golf club and master association.

(R. Ex. 16.)  Another advertisement published in the Fall 2006 issue of a magazine seen by Mr. Nahigian contained a similar disclaimer.  (P. Ex. G; R. Ex. 17; Ex. 5 at 243:20-245:09.)  Mr. Nahigian did not read either of these disclaimers.  (R. Ex. 5 at 243:09-11, 245:10-16.)

Prior to the Nahigians' purchasing property in the Development, Mr. Nahigian made 25 to 30 trips to visit Creighton Farms.  (R. Ex. 10 at No. 3.)  During these visits, the Nahigians spoke with several representatives of the Development, including Kimberly Fortunato, David Fenton and Jim Brown.[4]  (J.

---

[4] David Fenton was a limited partner in Fenton Partners, Ltd., a member of the parent company of Juno.  (R. Ex. 12.)  He worked in the Juno sales office. (R. Ex. 11 at 97:20-98:13.)  Plaintiff has offered no evidence that Mr. Fenton was acting on behalf of Ritz.  Jim Brown originally provided the land

Ex. A at 55-58; J. Ex. B at 16; R. Ex. 10 at No. 2.) None of these individuals worked for Ritz. (*See* Ritz's Facts ¶ 18.)

Kimberly Fortunato worked in the Development sales office initially as an employee of Juno and, at times relevant to the Amended Complaint, as an independent contractor to an affiliate of Juno. (R. Ex. 11, J. Ex. O at 8:13-20, 10:07-20, 11:18-12:03, 129.) The property Sales Office where Ms. Fortunato worked prominently displayed the Ritz trademark on its awning. (P. Ex. E at 57:23-58:14.) Ms. Fortunato's primary responsibility was to work with potential purchasers coming to visit the property, show them the property, and write contracts for the sale of property. (R. Ex. 11 at 13:9-14:11.) While she never explicitly told the Nahigians that she worked for Ritz or that they were buying land from Ritz, Ms. Fortunato's business card displayed Ritz's trademark and identified the Development as "A Ritz-Carlton managed Community." (Pls.' Opp. to Ritz's Mem. Ex C; R. Ex. 11 at 82:02-07; R. Ex. 9 at 17:20-18:16.) Ms. Fortunato made no statement to the Nahigians prior to their purchase of their lot that Ms. Fortunato believed at the time to be untrue. (J. Ex. O at 111-112.)

---

for the Creighton Farms development to Juno and was an investor in an affiliate of Juno. (R. Ex. 2 at 9:16-10:04, 49:11-17; R. Ex. 12.) Although Plaintiffs' interrogatory responses identify David Fenton and Jim Brown as being Ritz employees, Plaintiffs have offered no evidence to support these assertions. (*See* R. Ex. 10.) The Nahigians also spoke with Jessica Casper, a Ritz employee; however, this conversation happened only after the Nahigian's had purchased their lot. (R. Ex. 5 at 122:05-11.)

The Nahigians signed a contract to purchase a lot on June 1, 2007 (the "Purchase Agreement"), and the sale of the lot closed on July 6, 2007. (J. Ex N; R. Ex. 19.)  At closing, Juno received $1,674,000.00 toward the sales price of the property. (*See* P. Ex. I at ¶ 9; R. Ex. 19.)  The total amount due to Juno at closing was $1,712,170.95.  (R. Ex. 19; P. Ex. I.)  The Property has recently been appraised at a current market value of One Million, Two Hundred and fifty thousand dollars ($1,250,000.00).  (J. Ex. V.)

The Purchase Agreement states that it is the complete agreement between the parties, that prior discussions are merged into its written terms, and that reliance on any prior marketing materials or statements is expressly excluded.  (J. Ex. N.)  The Purchase Agreement did not state that Ritz would manage Creighton Farms for any specific period of time, although it indicates that a management contract will be entered into with a Ritz affiliate.  (J. Ex. N ¶ 24A.)  At the Plaintiffs' request, Keith Nahigian's brother, Ken Nahigian, an attorney who previously worked at the law firm of Jones Day LLP reviewed and marked up the purchase agreement before the Nahigian's signed it.  (R. Ex. 5 at 181:21-182:01.)  Plaintiff Keith Nahigian specifically asked his brother about the extent of Ritz's commitment to the project and Ken Nahigian told the Plaintiffs to ask about it.  (R. Ex. 5 182:02-183:19.)  Prior to signing

the agreement, the Plaintiffs did not ask to see any of the
agreements between Juno and Ritz, nor did they ask for written
confirmation as to the nature of any such agreements,
specifically, whether or not there was a management agreement
with a 30-year term.[5] (J. Ex. A at 254-256; J. Ex. B at 42-43.)
Plaintiffs did not ask for such a term to be included in the
Purchase Agreement. (R. Ex. 5 at 257:20-258:06; J. Ex. B at 42-
43.) There were no documents or information that the Nahigians
asked for that they did not receive. (R. Ex. 5 at 162:05-06; R.
Ex. 9 at 43:02-43:06.) No one refused to let Mr. Nahigian see
any of the facilities at the development or to answer any of his
questions. (R. Ex. 5 at 162:08-10, 162:15-16.)

### C. Plaintiffs are Sophisticated Purchasers

Plaintiffs Keith and Courtney Nahigian are married
residents of the Commonwealth of Virginia who agreed to purchase
property in the Creighton Farms Development on June 1, 2007
pursuant to a Purchase Agreement. (J. Ex. N.) Both Plaintiffs
are highly educated and accomplished professionals. (*See, e.g.*,
R. Ex. 5 at 18-29; J. Ex. B at 5-6, 10-11.) Mr. Nahigian has
experience as a commercial real estate developer and is a
partner in the Polo Towne Center commercial real estate
development in South Carolina. (R. Ex. 5 at 24:22-25:19.) Mr.
Nahigian is the founder, president, and sole officer of Nahigian

---

[5] The Nahigians had the contractual right to inspect documents relating to the
Golf Club. (R. Ex. 15 at 1000551.)

Strategies, LLC ("Nahigian Strategies"). (R. Ex. 5 at 29:04-18, 30:03-10.) Mr. Nahigian routinely uses written contracts with his Nahigian Strategies clients, and has testified that he incorporates every term of the agreement with his clients into the written contract. (R. Ex. 5 at 37:20-38:02.) Mr. Nahigian knows what a contractual "termination provision" is. (R. Ex. 5 at 14:05-14.) He has terminated contracts before pursuant to termination provisions. (R. Ex. 5 at 15:12-15.) In fact, most of Nahigian Strategies' contracts contain termination clauses. (R. Ex. at 15:20-16:21.)

### D. Interstate Land Sales Full Disclosure Act

The Development currently consists of more than 100 undeveloped lots that are part of the same subdivision. (*See* P. Ex. D at 82:14-83:4). Juno has sold a total of thirty-two lots, fourteen of which have been sold to builders. (P. Ex. D at 5:5-6; P. Ex. H § 6.) At no time did the Defendants inform the Nahigians of their rights under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* ("ILSFDA" or the "Act"). (*See* P. Ex. I § 8.) The Defendants did not prepare and furnish the Nahigians with a property report prior to the signing of the Purchase Agreement, as required by Section 1703(a)(1)(B). (*See* P. Ex. I § 8.) Juno also failed to inform the Nahigians in the Purchase Agreement that they had a statutory right to revoke the contract within two years of

entry, as required by Section 1703(c). (*See* P. Ex. I § 8.)  The

Defendants did not register the subdivision by filing the

required "statement of record" with the Secretary of Housing and

Urban Development prior to selling the lot to the Nahigians, as

required by Section 1703(a)(1)(A).  (*See* P. Ex. I § 8.)

### E.   Termination of Juno – Ritz Relationship

On February 20, 2009, Ritz notified Juno of an Event

of Default under the golf course operating agreement because

Juno had failed to make a required payment to Ritz in the amount

of $325,000.00.  (R. Ex. 21 (Notice of Event of Default) at RC1-

05091.)  On or about March 6, 2009, Juno, Ritz, and M&T Bank

entered into a Termination Agreement, pursuant to which Ritz

ceased to be involved with the project.  (R. Ex. 22 (Termination

Agreement).)

### F.   Procedural Posture

Plaintiffs filed an Amended Complaint in this case on

August 28, 2009 (the "Amended Complaint").  [Dkt. 28.]  The

Amended Complaint alleged three counts against Defendants: fraud

(Count One); violations of the Interstate Land Sales Full

Disclosure Act (Count Two); and violation of the Virginia

Consumer Protection Act (Count Three).  Defendants have both

previously moved for summary judgment as to Count Two based on

certain exemptions within that statute.  [*See* Dkts. 37, 57.]

These motions were denied.  [Dkts. 54-55, 80-81.]  On July 2,

12

2010, Plaintiffs moved for partial summary judgment as to Count II only.  [Dkt. 128.]  The same day, Defendants individually filed for Summary Judgment as to all counts.  [Dkts. 126, 134.] All parties have filed Opposition and Reply briefs.  The Motions for Summary Judgment are now before the Court.

## II. Standard of Review

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).  The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quotation omitted).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Id*. at 255; *see also Lettieri v. Equant Inc*., 478 F.3d 640, 642 (4th Cir. 2007).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 248-52. Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 412 (4th Cir. 2009) (*citing* Fed. R. Civ. P. 56(c)); *see Anderson,* 477 U.S. at 248.

## III. Analysis

The Court will address the parties' Summary Judgment motions regarding Plaintiffs' federal claims before addressing Summary Judgment regarding Plaintiff's Virginia fraud claims.

### A. ILSFDA Claims

All parties have moved for summary judgment as to Plaintiff's ILSFDA claim (Count Two). [Dkts. 126, 128, 134.] This Court has previously ruled that the Development meets the ILSFDA's definition of "subdivision" and is not exempt under the "One Hundred Lot Exemption" (§ 1702(b)) and/or the "Sales to Builders Exemption" (§ 1702(a)). The Court will not revisit these issues here.[6] [*See* Dkts. 54, 80.] This Court has not yet

---

[6] The Act applies to "subdivisions" which are defined as "any land . . . divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of *a common promotional plan*." 15

14

held, as a matter of law, that the ILSFDA imposes any requirements on the particular Defendants in this case, that the Defendants failed to meet these requirements, or that the Plaintiffs are entitled to some form of recovery. These issues are now before the Court.

ILSFDA was enacted as part of the Housing and Urban Development Act of 1968 and amended in 1979. *See* Pub.L. No. 96-153, Title IV, 93 Stat. 1122 (1979). The Act is "an antifraud statute utilizing disclosure as its primary tool with the principal purpose of protect[ing] purchasers from unscrupulous sales of undeveloped home sites." *Kamel v. Kenco/The Oaks at Boca Raton LP*, 321 Fed. App'x 807, 809 (11th Cir. 2008) (citations omitted). ILSFDA is a remedial statute enacted to "prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 778 (1978); *Long v. Merrifield,* No. 08-2371, 2010 WL 2744650, at *9 (4th Cir. Jul. 13, 2010). "Congress designed ILSFDA to protect purchasers of

---

U.S.C. § 1701(3) (emphasis added). Congress created a presumption under the Act that units in a development are considered part of a "common promotional plan" (and thus part of the same subdivision):

> where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous, or is known, designated or advertised as a common unit or by a common name, *such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan*.

15 U.S.C. § 1701(4)(emphasis added); *See Pigott v. Sanibel Development, LLC*, 576 F. Supp. 2d 1258, 1276 (S.D. Ala. 2008).

land from fraud by requiring sellers to make certain disclosures
in advance of a purchaser's signing the sales contract." *Ahn v.
Merrifield Town Center Ltd. P'ship,* 584 F. Supp. 2d 848, 853
(E.D. Va. 2008). Through ILSFDA's disclosure requirements,
Congress intended to ensure that, "*prior to purchasing* certain
types of real estate, a buyer [is] apprised of the information
needed *to make an informed decision*." *Long*, 2010 WL 2744650, at
*9 (citing *Markowitz v. Ne. Land Co*., 906 F.2d 100, 103 (3rd
Cir. 1990); *Ahn*, 584 F. Supp. 2d at 853 (same).

    1.   <u>Requirements</u>

      The Act makes it unlawful for a "developer or agent"
of a covered subdivision to use

> "any means or instruments of transportation or
> communication in interstate commerce, or of the mails
> . . . to sell or lease any lot unless a statement of
> record with respect to such lot is in effect . . .
> [and] a printed property report . . . has been
> furnished to the purchaser or lessee in advance of the
> signing of any contract or agreement by such purchaser
> or lessee."

15 U.S.C. § 1703(a)(1). The "Statement of Record" must contain
specific disclosures to the potential purchaser. 15 U.S.C. §
1705. The developer must provide the "Property Report" to the
purchaser prior to executing the purchase agreement. 15 U.S.C.
§ 1703(a)(1)(B). If the developer fails to do so, the purchaser
has the option of revoking the contract within two years of the
date of signing. 15 U.S.C. § 1703(c). The purchaser's right of

revocation must be acknowledged *in the purchase agreement*. 15 U.S.C. § 1703(c) (emphasis added). The Nahigians specifically point to the failure to provide a Property Report (15 U.S.C. § 1703(a)) and the failure to provide in the Purchase Agreement the right to revoke within two years if a Property Report is not provided (15 U.S.C. § 1703(c)) as omissions justifying Summary Judgment. (Pls.' Mem. at 16-17, 19-21.)

## 2. Developer

The Act imposes requirements only against a "developer or agent." 15 U.S.C. §§ 1709(a)-(b).[7] In determining whether an ILSFDA violation has occurred, whether an exemption applies or whether an obligation exists, a court examines the facts as they existed at "the moment at which a purchaser signs a sales contract [for a lot purchase] and incurs obligations." *See, e.g., Ahn*, 584 F. Supp. 2d at 856. Thus, this Court must determine whether the Defendants were "developers or agents" within the meaning of the Act, up to and including June 1, 2007, the day Plaintiffs signed the Purchase Agreement.

The Act defines "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or

---

[7]"A purchaser or lessee may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title. In a suit authorized by this subsection, the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable." 15 U.S.C. § 1709(a). "A purchaser or lessee may bring an action at law or in equity against the seller or lessor (or successor thereof) to enforce any right under subsection (b), (c), (d), or (e) of section 1703 of this title." 15 U.S.C. § 1709(b).

lease, or advertises for sale or lease any lots in a subdivision." 15 U.S.C. § 1701(5). An "'agent' means any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision." 15 U.S.C. § 1701(6). While it is undisputed that Juno as the seller of the property is a "developer" within the meaning of the Act, Ritz argues that, as the Plaintiffs purchased the property from Juno, Ritz could not, as a matter of law, be a developer or agent ("seller"). (*See*, Ritz's Opp. to Pls.' Mot. for Summ. J. at 2.)

On the facts as submitted by the parties in this case it is clear that Ritz did not directly sell any lot, nor did Ritz directly expend its own funds to "advertise[] for sale or lease any lots in a subdivision." (*See, e.g.*, R. Ex. 2 at 61:20-22 ("Q. Did [Ritz-Carlton] conduct any marketing or sales activities with respect to Creighton Farms? A. No."); R. Ex. 11 at 86:14-17 ("Q. And so all the advertising, to your knowledge, would have been paid for by Juno-Loudoun; is that correct? A. Correct.")) Plaintiffs have not submitted an advertisement wherein Ritz itself is promoting the "sale or lease of lots" in the Development. The determinative issue here is thus whether or not the use of Ritz's trademark in advertising is sufficient to qualify Ritz as a "developer."

In support of a broader interpretation of "developer," Plaintiffs cite to the case of *Hammar v. Cost Control Marketing & Sales Management of Virginia*, 757 F. Supp. 698 (W. D. Va. 1990). In *Hammar* the district court considered a claim under the Act involving the Lake Monticello subdivision that had several "affiliates" involved in the project. A defendant bank's pre-discovery motion for summary judgment was denied, as the Court found that "[t]he plaintiffs should have the opportunity for full discovery" on the factual question of whether or not the bank could be considered a developer. *Id.* at 703. The Court found that "when a financial institution allows its name to be used in advertisement and announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers." *Id.* at 703-704. The court also noted that the Act has been "construed to include all of those engaged in the selling effort." *Id*.

Here, Plaintiffs argue that, in the words of Kim Fortunato, "everything had to be run past [Ritz] for use of the mark" (*See* P. Ex. E at 17:5-7) and several advertisements for the community from the relevant period displayed the Ritz trademark immediately above the words "A Ritz-Carlton Managed community." (*See* P. Ex. G.) Plaintiffs equate this involvement

to the involvement of the lending institution in *Hammar* and argue that, similarly, Ritz is "in effect lending its prestige and good name to the sales effort." (Pls.' Mem at 14 (citing *Hammar,* 757 F. Supp. at 702-703.)

Ritz contends that the term "developer" should be interpreted more narrowly. In support of its interpretation Ritz argues that its approval of various uses of its trademark is not sufficient for Ritz to be found to have been "advertising" under the meaning of the Act. (Ritz's Opp. at 19.) Under its contracts with Ritz, Juno was required to obtain prior approval before using Ritz's name and logo on Creighton Farms signage, awnings, and other items. (*See* Ritz's Opp. to Pls.'s Mem. R. Ex. B at 62:23-63:17.) In practice, however, this did not always happen. (*See, e.g.*, R. Ex. B. (noting that an awning at Creighton Farms that improperly displayed a Ritz logo was taken down by Juno at the request of Ritz). In addition, unlike in *Hammar* where the defendant bank was advertised as an "affiliate" developer, whenever an advertisement used Ritz's trademark, it also contained a disclaimer specifically stating that the Development was not "owned, developed or sold by The Ritz-Carlton." (*See, e.g.*, R. Ex. 16 (Brochure provided to Mr. Nahigian).) Ritz argues that these advertisements, paid for by Juno, do not establish that Ritz is a "developer" within the meaning of the Act.

Ritz distinguishes *Hammar*, arguing that in *Hammar* the court was concerned with regulating the involvement of commercial banking in the area of real estate development. (*See Hammar*, 757 F. Supp. at 702-703.) The court's holding was narrowly targeted at financial lending institutions. *Id.* (specifying "[w]hen a *financial institution* allows its name to be used in advertisements"). The Court went into the subject at length:

> Commercial banks lend money. They analyze the risk, make the loan, and keep their hands off the subject of the loan unless trouble starts to brew. That is their ordinary course of dealing. Commercial banks are not in the business of developing or marketing real estate. . . . When regulations [on savings and loan institutions] were relaxed . . . those institutions aggressively engaged in the financing, developing, and marketing of very speculative real estate projects. In part because many of these projects failed, the savings and loan industry in some areas became insolvent and left the country with a grave crisis. . . . Allowing commercial banks to exceed the scope of ordinary dealing in real estate ventures would leave open the door to disaster.

*Id.* The *Hammar* court found that the defendant bank had been "participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers." Hammar, 757 F. Supp. at 702-703. Ritz argues that this holding regarding a commercial bank cannot be used to broaden the definition of "developer" to include a property management company. (Ritz's Opp. at 23.)

Alternatively, Ritz points to the Third Circuit case of

*Bartholomew v. Northampton National Bank of Easton*, 584 F.2d
1288 (3d Cir. 1978), wherein the plaintiffs argued that the
defendant banks, who provided financing for a development
project, were indirect sellers "as planners, participants, and
profit-makers." *Id*. at 1292-93.  After careful review of the
text of ILSFDA, the court concluded that the statute's plain
language "clearly limits the imposition of liability to those
who meet the definitions of developers or agents of developers"
and that "[d]evelopers are those who directly or indirectly
engage in selling efforts." *Id*. at 1293 (citing *Ernst & Ernst
v. Hochfelder*, 425 U.S. 185, 197 (1976)).  The court reasoned
that "since the Act provides for liability for misstatements or
omissions in the statutorily required Statement of Record and
Property Report or in statements made to offerees of lots in a
subdivision, logically the statute should be interpreted to
include within its scope only those engaged in the selling
effort." *Id*. at 1293.  The court concluded that "Congress
intended the developer to be liable for its own acts and those
of its agents, which is the usual rule, but it did not mean to
scoop up every guide or salesman . . . and make them pay unless
they, too, have authority to sell and do so." *Id*. at 1293
(quoting *Paquin*, 519 F.2d at 1111).

This Court finds *Bartholomew* more applicable than
*Hammar* here.  Ritz was not an "affiliate" developer and had no

equity stake in the Development. Ritz had no authority to execute the sale of the property. Ritz did not sell Plaintiffs its lot. Ritz had no authority to sell lots in the Development and did not sell lots in the Development. Ritz cannot not be considered a "developer" under ILSFDA on the facts before this Court. 15 U.S.C. § 1701(5). Ritz was not a party to the Purchase Agreement and had no specific knowledge that the Plaintiffs were preparing to purchase a lot in the development. The violations that Plaintiffs have cited involve the provision of a property report and notice in the Purchase Agreement about the right of revocation under ILSFDA. Ritz, as a non-owner of the property and non-seller of the property, was not aware that Plaintiffs were about to enter into the agreement, nor was Ritz a party to the Purchase Agreement with standing to insist that certain disclosures be made in the Agreement. Because there is no genuine issue of material fact suggesting that Ritz be considered a "developer" or "agent" within the meaning of the Act, Judgment must be entered in favor of Ritz as to Count II.

As defendant Juno is indisputably a "developer" under the Act, the Court will continue to analyze the cross summary judgment motions as they apply to Juno.

3.    Compliance

As stated above, the "Statement of Record" must contain specific disclosures to the potential purchaser.  15

U.S.C. § 1705.  The developer must provide the "Property Report" to the purchaser prior to executing the purchase agreement.  15 U.S.C. § 1703(a)(1)(B).  If the developer fails to do so, the purchaser has the option of revoking the contract within two years of the date of signing.  15 U.S.C. § 1703(c).  The purchaser's right of revocation must be acknowledged *in the purchase agreement*.  15 U.S.C. § 1703(c).  There is no genuine issue of material fact that an ILSFDA Property Report was not furnished to the Plaintiffs and that the Purchase Agreement did not contain a notice of the right of revocation.  (*See* P. Ex. I (attached Purchase Agreement at ¶ 8).)  Juno is thus in violation of ILSFDA.

        4.   Remedy

     Under Section 1709 of ILSFDA, a court may order "damages, specific performance, or such other relief as the court deems fair, just and equitable" including, "interest, court costs, and reasonable amounts for attorneys' fees." 15 U.S.C. §§ 1907(a)-(c).  While defendants again argue that a two-year statute of limitation applies for violations of § 1703(c), a recent Eastern District of Virginia decision specifically rejected this construction and held that "the scant case law addressing these issues has incorrectly presumed that the *only* ILSFDA revocation or rescission remedies are those automatic revocation rights in §§ 1703(b), (c), and (d)." *Plant v.*

*Merrifield Town Center Ltd. P'ship,* No. 1:08cv374, 2009 WL
2225415, at *3 (E.D. Va. 2009) ("*Plant* 2009") (Ellis, J.)
(emphasis added). In fact "the *three-year* limitation period of
15 U.S.C. § 1711 governs those circumstances in which a
purchaser seeks rescission that is not automatic, but must be
supported by proper proof." *Id.* In a later ruling in the same
case, the court held that "equitable rescission" is an
appropriate remedy under ILSFDA "if the required elements are
established." *See Plant v. Merrifield Town Center, Ltd. P'ship.*
("*Plant 2010*"), No. 1:08cv374, 2010 WL 1039875 *12 (E.D. Va.
2010). It is this remedy of equitable rescission, not
rescission as of right, which Plaintiffs seek here.

Under the *Plant 2010* holding, equitable "rescission is
available under ILSFDA only if plaintiffs can prove objective
materiality." *Id.,* 2010 WL 1039875 at *12. "Mis-statements or
omissions [regarding ILSFDA] are material when they 'would have
influenced the decision' to enter the disputed contract with the
omitting or misrepresenting party." *See id.* (*citing Shipley v.
Ark. Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir.
2003)). The parties agree that this standard is "an objective
one; in other words rescission is appropriate where an omission
would be likely to affect the conduct of a reasonable man." *See
id.* (citing Rst. (First) of Contracts § 470 (1932)); Pls.' Mem
at 20-21; Juno's Opp. at 13.).

25

The Plaintiffs argue that both the omission of the two-year revocation notice and the failure to furnish Plaintiffs with a Property Report were "material" to their decision to enter the disputed contract. Plaintiffs argue that the Property Report, pursuant to 15 U.S.C. § 1705, would have included:

> (1) The name and address of each person or entity having an interest in the lots; (2) A legal description of the lots with a map showing divisions and dimensions; (3) A statement of the title to land including all encumbrances; (4) A statement of the general terms and conditions on the land, including the range of selling prices; (5) A statement of present condition of access, including access to water, sewage and other public utilities, the nature of any improvements to be installed by the developer and his estimated schedule for completion; (6) Such certified or uncertified financial statements as HUD may require.

(Pls.' Mem. at 20 (citing 15 U.S.C. § 1705.)) Plaintiffs continue that the Property Report would have clarified in writing (i) the actual (not represented) relationship between the partners Juno and Ritz, (ii) the financial ability of Juno to develop the project on its own (which was minimal), and (iii) the extent "and nature" of Ritz's anticipated preparation of "any improvements to be installed by the developer and his estimated schedule for completion" pursuant to § 1705(5). (Pls.' Mem. at 21.) Plaintiffs also correctly point out that it

is difficult to prove the "materiality" of a document that was never created.[8]

Here the Court finds that Plaintiffs have shown that the "mis-statements [and] omissions [regarding ILSFDA] are material" as they would have influenced the Plaintiffs' decision to enter the Purchase Agreement. *See Plant 2010,* 2010 WL 1039875 at *12. The Court notes that it is difficult to determine what would have been included in a Property Report that never existed; however, a Property Report that never mentioned Ritz at all or an agreement with Ritz would be material to the decision to enter into the Purchase Agreement. Additionally, and as an independent basis for the Court's finding, a Property Report that did not include description of, for example, the golf course club house, the Ritz Kids Day Care center, or other amenities as part of "the nature of any improvements to be installed by the developer and his estimated schedule for completion" would have been material. *See* 15 U.S.C. § 1705(5). As these omissions were material the remedy of Rescission is available to Plaintiffs.

Juno was required to comply with ILSFDA and failed to do so, thus judgment will be entered against Juno as to Count II

---

[8] Plaintiffs argument that failure to provide notice of the "right of revocation" was material; however, this argument, without more, is unavailing as they provide no evidence that if they had been provided notice of the right to revoke *at the time they signed the agreement* it would have "influenced the decision to enter the disputed contract with the omitting or misrepresenting party." *See Plant 2010, 2010 WL 1039875* at *12.

and this Court will award Plaintiffs rescission of the Purchase Agreement and requisite closing documents pursuant to 15 U.S.C. § 1709 and the appropriate interest in amounts to be determined.[9]

### B. State Fraud Claims

Defendants have filed separate Summary Judgment motions regarding Plaintiffs' state law fraud claims.[10]  Under Virginia law, a cause of action for actual fraud requires the plaintiff to prove by clear and convincing evidence (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) *resulting damage to the party misled*.  *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 367 (Va. 2003) (emphasis added); *Petra Int'l Banking Corp. v. First American Bank of Virginia*, 758 F. Supp. 1120 (E.D. Va. 1991).  As Plaintiffs twice conceded in oral argument, the awarding of rescission renders Plaintiffs' claims for fraud damages moot. (*See* Aug. 6, 2010 Tr. Excerpt at 3:11-24 [Dkt. 163].)  Although Plaintiffs' fraud claims are moot, this Court finds without deciding, that Plaintiffs have failed to present evidence that

---

[9] This Court will require additional briefing from the parties to determine the relevance of Nahigian Strategies LLC, the appropriate amount of pre-judgment interest, the sum to be exchanged for the title of the Property, and any additional matters required to restore the parties to the *status quo ante*.

[10] Defendants' arguments for Summary Judgment as to the common law fraud claim apply equally to Plaintiffs' claim under the Virginia Consumer Protection Act.

would permit a reasonable jury to conclude that Plaintiffs have established fraud "damages" as defined by Virginia law.[11]

The Virginia Supreme Court has held that proof of damages is required to establish recovery for fraud and that the measure of damages is defined as "the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the [fraudulent] representation been true." Kla*iber v. Freemason Assoc., Inc.* 266 Va. 478, 485-486 (Va. 2003) (citing *Prospect Develop. Co. v. Bershader,* 258 Va. 75, 91 (Va. 1999)). Demonstrating that the value of the property is lower now than it was at the time of purchase is not sufficient. *See Carstensen v. Chrisland Corp.*, 247 Va. 433, 444-445 (Va. 1994) (holding that where the evidence points to several causes, the evidence does not establish the damages suffered).

In *Carstensen* the plaintiffs attempted to prove their damages by establishing that the current assessed values of the properties at issue were lower than the purchase prices; however, they failed to establish that the decrease in value was based solely on the fraudulent statements. *Id.* The Virginia Supreme Court noted that "the decrease in value may have been because of the economy or they paid too much for it" and held

---

[11] As the first element of the Virginia Consumer Protection Act is establishing a "fraud," this ruling applies with equal force to Count III. *See* Va. Code § 59.1-200(A).

that "without quantifying the amounts associated with each of the factors [] associated with the current value, [the evidence offered] does not establish the damages suffered." *Id.* Here, the Nahigians' only evidence of damages is the report of their expert stating that the value of the Property and real estate in Loudoun County generally have declined as of specified dates, but does not opine as to any impact that Ritz-Carlton's presence or absence at Creighton Farms would have on lot value. (*See* Juno Ex. V; Ritz's Mot. at 23-27.) As Juno's expert points out, the rate of depreciation for the Nahigian lot is slightly less than the rate of depreciation in value of similar residential real estate in Loudoun County, Virginia, during the same time and "there is no basis to determine the effect of the withdrawal of Ritz-Carlton Hotel Company, LLC, from the Creighton Farms project on the market value of the Nahigian lot." (Juno Ex. W at 1-2.)

Plaintiffs argue that their inability to prove damages is not fatal to their fraud claim because rescission is available as an alternative to damages. (*See* Pls.' Opp. to Juno's Mot. at 14.) What the Nahigians misstate is that rescission is available only after a plaintiff has proved all elements of fraud, which, per this Court's opinions and all the parties' briefs, includes damages as an essential element. The cases cited by the Nahigians are not to the contrary. For

example in *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042 (E.D. Va. 1987), which the Nahigians rely upon in their brief, the Court specifically notes plaintiff's burden to prove the element of damages and notes that all elements of fraud, including damages, must have been proved before considering rescission as an alternative remedy. 659 F. Supp. at 1057. Accordingly, the Nahigians' claim of actual fraud fails as a matter of law and Judgment will be entered in favor of the Defendants on Counts I and III.

## IV. Conclusion

For the reasons stated above, the Court will grant Defendant Ritz's Motion for Summary Judgment, will grant in part and deny in part Defendant Juno's Motion for Summary Judgment, and will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment. An appropriate Order will issue.


|                                  | /s/                                        |
| -------------------------------- | ------------------------------------------ |
| August 23, 2010                  | James C. Cacheris                          |
| Alexandria, Virginia             | UNITED STATES DISTRICT COURT JUDGE         |