IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

KEITH NAHIGIAN, *et al.*,           )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )    1:09cv725 (JCC)
                                    )
JUNO-LOUDOUN, LLC, *et al.*,        )
                                    )
        Defendants.                 )

## A M E N D E D   M E M O R A N D U M   O P I N I O N[1]

This matter is before the Court on the parties' briefs addressing the appropriate amount due to both parties upon rescission of the Purchase Agreement dated June 1, 2007 (the "Purchase Agreement"), by and between Plaintiffs Keith and Courtney Nahigian ("Plaintiffs") and Defendant Juno-Loudoun, LLC ("Defendant").  For the following reasons, the Court will grant in part and deny in part Plaintiffs' Motion for Pre-Judgment Interest and Costs and Attorneys' Fees.  [Dkt. 175.]

---

[1]  The Memorandum Opinion issued on October 26, 2010 [Dkt. 191] included a calculation error on page 36 regarding the award of Plaintiffs' attorneys' fees.  The Court clarifies that the correct amount of attorneys' fees is $93,392.55 and accordingly issues this Amended Memorandum Opinion reflecting the correct amount on page 36.  This Amended Memorandum Opinion is unchanged in all other respects from the original Memorandum Opinion.  The original Memorandum Opinion [Dkt. 191] shall have no force or effect as it has been superseded in all respects by this Amended Memorandum Opinion.  The original Order [Dkt. 192] issued concurrently with the original Memorandum Opinion is also superseded by the Amended Order issued concurrently with this Amended Memorandum Opinion and shall have no force or effect.

## I.   Background

In an August 23, 2010, Order (the "August 23 Order"), this Court granted summary judgment in favor Plaintiffs, awarding the remedy of rescission of the Purchase Agreement. Paragraphs (7) through (9) of the August 23 Order directed the parties to address the "appropriate amount due to both parties upon rescission of the Purchase Agreement and requisite closing documents, the appropriate amount (if any) of pre-judgment interest and all associated fees and/or costs, and any other matter relevant to the effective execution of rescission." [Dkt. 166.]

### 1.   The Purchase

Plaintiffs purchased a parcel of real property in the Creighton Farms subdivision in Loudon County, Virginia. (Plaintiffs' Facts[2] ¶ 2.)  The terms of Plaintiffs' purchase were memorialized in the Purchase Agreement, and the sale closed on July 6, 2007.  (Plaintiffs' Facts ¶ 3; Def. Ex.[3] 1-2.)  At closing, Plaintiffs' purchase price was $1,674,000.00 and their closing costs were $38,170.95.  (Plaintiffs' Facts ¶ 37; Def. Ex. 1-2.)

Plaintiffs filed an Amended Complaint on August 28, 2009, alleging Defendant violated certain portions of the

---

[2] Plaintiffs' Statement of Uncontested Material Facts in Support of Summary Judgment [Dkt. 131] will be referred to as "Plaintiffs' Facts."
[3] Exhibits to Defendant's Opening Brief [Dkt. 174] will be referred to as "Def. Ex." and exhibits to Plaintiff's Memorandum in Support [Dkt. 176] will be referred to as "P. Ex."

Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et
seq.* ("ILSFDA"), among other claims.  (Mem. Op.[4] p. 12.)  In the
August 23 Order, this Court granted summary judgment in favor of
Plaintiffs on their ILFSDA claims, finding that Defendant failed
to comply with ILFSDA's requirement that, in certain instances,
a developer of a subdivision must provide a "Property Report" to
the purchaser prior to executing the purchase agreement and set
forth in the contract purchaser's right of revocation within two
years for the developer's failure to provide a "Property
Report."  (Mem. Op. p. 24; *see* 15 U.S.C. §§ 1703(a)(1)(B), (c).)
This Court awarded Plaintiffs rescission of the Purchase
Agreement and requisite closing documents pursuant to 15 U.S.C.
§ 1709 and appropriate interest in amounts to be determined.
(Mem. Op. p. 28.)

         2.   Procedural Background

         Pursuant to the August 23 Order, Plaintiffs filed with
this Court their "Motion for Pre-Judgment Interest and Costs and
Attorneys' Fees," and an accompanying Memorandum in Support
("Plaintiffs' Mem.") on September 3, 2010.  [Dkt. 175, 176.]
Also on September 3, 2010, Defendant filed its "Opening Brief
Regarding Specific Issues Relating to the Effective Execution of
Rescission" ("Defendant's Brief").  [Dkt. 174.]  On September
16, 2010, Defendant filed its opposition ("Defendant's Opp."),

---

[4] This Court's Memorandum Opinion accompanying its August 23 Order will be
referred to as "Mem. Op."

and Plaintiffs filed their response ("Plaintiffs' Response").
[Dkt. 183, 185.]  The matters addressed in these briefs are
before the Court.

## II.  Analysis

### A.   Equitable Rescission Standard

This Court awarded Plaintiffs the remedy of equitable
rescission of the Purchase Agreement.  In equitable rescission,
"a court [] grants rescission or cancellation [of a contract],
and its decree wipes out the instrument, and renders it as
though it does not exist." *Griggs v. E.I. DuPont de Nemours &
Co.*, 385 F.3d 440, 446 (4th Cir. 2004) (citations omitted); *see
also Sylvania Industrial Corp. v. Lilienfeld's Estate*, 132 F.2d
887, 892 (4th Cir. 1943) ("To rescind a contract is not merely
to terminate it but to abrogate and undo it from the beginning;
that is, . . . to annul the contract, and to restore the parties
to the relative positions which they would have occupied if no
such contract had ever been made." (citation omitted)).  Though
the goal of equitable rescission is restoring the parties to the
*status quo ante* and providing "full or complete restoration of
the benefits exchanged[,] . . . the complete-restoration
requirement is a general one that is subject to certain
exceptions." *Griggs*, 385 F.3d at 447.  As recently stated by
this Court, "restoration of the *status quo ante* is generally
required, unless the equities of the situation demand rescission
even though full restoration is not possible." *Plant v.*

4

*Merrifield Town Center Ltd. Partnership*, No. 1:08cv374, 2010 WL
1039875, at *12 (E.D. Va. Mar. 18, 2010).  The Court will look
to these principles in fashioning the rescission remedy in this
case.

         B.   Statutory Basis for Amount

         ILFSDA is not without guidance as to the particular
contours of the equitable rescission remedy.  The Court granted
rescission pursuant to 15 U.S.C. § 1709.  (Mem. Op. p. 28).
Specifically, section 1709(a) provides the "relief recoverable"
to a purchaser bringing an action for violations of section
1703(a), the provision this Court found Defendant to have
violated.[5]  Section 1709(a) provides courts with great discretion
in determining the remedy for violations of section 1703(a):

> [T]he court may order damages, specific
> performance, or such other relief as the court
> deems fair, just, and equitable.  In
> determining such relief the court may take into
> account, but not be limited to, the following
> factors: the contract price of the lot or
> leasehold; the amount the purchaser or lessee
> actually paid; the cost of any improvements to
> the lot; the fair market value of the lot or
> leasehold at the time relief is determined; and
> the fair market value of the lot or leasehold
> at the time such lot was purchased or leased.

15 U.S.C. § 1703(a).  Additionally, 15 U.S.C. § 1709(c) provides
that "in addition to matters specified in [section 1709(a)]," a

---

[5] This Court found that Defendant violated section 1703(a).  Specifically,
Defendant did not prepare and furnish the Plaintiffs with a property report
prior to the signing of the Purchase Agreement, as required by section
1703(a)(1)(B), and did not register the subdivision by filing the required
"statement of record" with the Secretary of Housing and Urban Development
prior to selling the lot to Plaintiffs, as required by Section 1703(a)(1)(A).
(Mem. Op. p. 11-12.)

successful plaintiff may recover "interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot." This Court, then, will look to these provisions in fashioning the equitable rescission remedy in this case.

Defendant argues, however, that the Court should look to 15 U.S.C. 1703(e) for ILFSDA's statutory guidance as to the contours of the remedy. (Defendant's Brief p. 3; Defendant's Opp. pp. 1-3.) Section 1703(e), according to Defendant, by its plain language limits Plaintiffs' recovery to "all money paid by [them]" under the Purchase Agreement, thereby excluding closing costs and other amounts not paid under the contract. *Id*. Defendant argues that "it would be anomalous and inconsistent with Congressional intent for a court to allow purchasers who fail to seek revocation within the [two-year] time allowed by 15 U.S.C. § 1703(c) to recover more" upon an equitable rescission granted outside of that two-year limit for automatic revocation than "purchasers who timely seek automatic revocation within the two years." (Defendant's Brief p. 3)

As this Court has stated, however, section 1703(c) provides the remedy for a purchaser's exercise of his or her *automatic* revocation rights and does not apply to instances in which a purchaser seeks revocation that is not automatic, but must be supported by proof. (Mem. Op. pp. 24-25.) When a

purchaser seeks such non-automatic revocation, he or she does so pursuant to section 1703(a), not 1703(c).  ILSFDA, by its plain terms, provides a different remedy for violations of section 1703(a) than the automatic revocation provided in section 1703(c)--section 1709(a) is the provision providing the remedy for violations of section 1703(a).

Moreover, section 1703(c) goes on to state that "such contract [] shall clearly provide this right."  Where, as here, that revocation right is not provided in the contract, section 1703(c) is inapplicable.  It would be anomalous and inconsistent with Congressional intent for a court to set a ceiling on ILFSDA remedies for violations of section 1703(a) by allowing a developer to omit from a purchase agreement the automatic revocation right required by section 1703(c) and, then, to use section 1703(e) as a shield when the purchaser does not exercise the automatic revocation right that was not provided in the purchase agreement.

C.   Equitable Rescission Applied Here

In effecting rescission, Plaintiffs request five categories of relief: (1) repayment of the purchase price, (2) repayment of closing costs, (3) repayment of a golf club membership fee, (4) an award of pre-judgment interest, and (5) an award of attorneys' fees and costs.  The Court will address each in turn, applying the equitable rescission principles found

7

in *Griggs* and the contours provided in sections 1703(a) and (c)
of ILFSDA.

      D.    <u>Amount for Purchase Agreement Itself</u>

      Plaintiffs seek to recover $1.674 million, the
entirety of the purchase price for the parcel. (Plaintiff's
Brief p. 6.)  Defendant argues that even without considering the
equities involved in this case, Plaintiffs' recovery should be
limited to $1.5 million, the amount to which Plaintiffs are
personally obligated under their note with BB&T.  (Defendant's
Brief pp. 3-4.)  Nahigian Strategies, LLC (the "LLC"), paid the
deposit and down-payment on the property, not Plaintiffs.
Defendant argues that this Court, as permitted by section
1709(a), should consider the amounts paid by the LLC and should
limit Plaintiffs' recovery to no more than they personally,
actually paid.

      Defendant's argument has some merit.  According to
their own "Proposed Stipulation of Uncontested Facts," submitted
on June 17, 2010 [Dkt. 101.], the LLC and not Plaintiffs paid
all amounts at closing.  The purchase was accounted for by the
LLC as an investment and not as Plaintiffs' personal residence.
(Defendant's Brief p. 4.)  Plaintiffs acknowledge the LLC has
paid the carrying costs on the Plaintiffs' $1.5 million mortgage
with BB&T. (Plaintiffs' Brief p. 7.)  This Court has barred
Plaintiffs from using as evidence in this case any purported
agreement with the LLC to repay those sums.  [Dkt. 135.]

Clearly, the LLC is a distinct legal entity that is not party to this proceeding.

Defendant's argument, however, overlooks two significant points. First, the goal of rescission is to render the rescinded contract as though it never existed, annulling it and "restor[ing] the parties to the relative positions which they would have occupied if no such contract had ever been made." *Griggs*, 385 F.3d at 446; *Sylvania Industrial Corp.*, 132 F.2d at 892. Plaintiffs, and not the LLC, are Defendant's counterparty to the Purchase Agreement. Limiting Plaintiffs' recovery under the Purchase Agreement to less than the benefit received by Defendant would neither render the contract as though it never existed nor return both parties to their relative positions *ex ante*. Plaintiffs' recovery is only one side of the remedy; Defendant must disgorge all benefits received under the Purchase Agreement to restore Defendant to its position prior to the execution of the contract and to prevent Defendant from unjustly profiting from its ILFSDA violation. Limiting Plaintiffs' recovery to the amount of their personal liability under the BB&T note does not accomplish this. Second, with respect to the LLC's role, it is undisputed that the LLC is a single-member, Virginia limited liability company, the membership interests of which are owned entirely by Keith Nahigian. As such, for economic purposes the LLC and Plaintiffs

are indistinct, irrespective of whether Plaintiffs and the LLC
had any repayment agreement between them.  *See* 26 C.F.R. §
301.7701-3(b)(ii) (Unless elected otherwise, a limited liability
company is "[d]isregarded as an entity separate from its owner
if it has a single owner"); Va. Code Ann. § 13.1-1002
("'Membership interest' or 'interest' means a member's share of
the profits and the losses of the limited liability company and
the right to receive distributions of the limited liability
company's assets.").  Assuming, *arguendo*, that this Court were
inclined to limit Plaintiffs' recovery based on the amount they
actually paid, any funds provided by the LLC ultimately were
provided by Plaintiffs, as the LLC's income and loss are passed-
through directly to its sole owner.

        Defendant also argues that special equities in this
case make the appropriate recovery $1.25 million, the parcel's
current fair market value.  (Defendant's Brief p. 6.)  Defendant
argues that the grounds on which Plaintiffs' sought rescission
have not had any measurable impact on the lot's decline in
value, that Defendant's technical violation of ILFSDA was made
in good faith, that the property was an investment and
investments have generally declined in value since the purchase,
and that this case is not of the sort ILFSDA was designed to
remedy.  (Defendant's Brief pp. 6-7.)  As support for the
proposition that this Court may adjust the amount returned upon

rescission, Defendant cites *Griggs*.  *See Griggs*, 385 F.3d at 447 ("While a few courts speak in formal terms of very specifically delineated exceptions to the general rule requiring complete restoration of benefits, . . . what is most often applied is some form of a requirement to consider the equities of the situation and apply an exception to the general rule where required.") (citations omitted).  The *Griggs* court examined various cases for this proposition.  *Id.* (citing *Grymes v. Sanders*, 93 U.S. 55, 62, 23 L.Ed. 798 (1876) ("A court of equity is always reluctant to rescind, unless the parties can be put back in status quo. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it.").

The *Griggs* court concluded that "it is clear to us that courts of equity did not automatically *deny relief to a plaintiff* seeking rescission in cases where complete restoration of benefits could not be accomplished." *Id.* at 448-49 (emphasis added).  Further, as recently stated by this Court, "restoration of the *status quo ante* is generally required, unless the equities of the situation demand rescission *even though full restoration is not possible*." *Plant*, 2010 WL 1039875, at *12 (emphasis added).  The exception to complete rescission appears to serve as protection for a plaintiff seeking rescission, namely, to permit a court to grant rescission even though that

plaintiff cannot fully restore the defendant to the *status quo ex ante*.  Here, Plaintiffs' are willing and able to do so.  Even reading the cases as establishing some form of general requirement to consider the equities of the situation and apply an exception to the general rule of complete restoration, Defendant's argument is unavailing.  As stated above, rescission restores *both* parties to their relative positions before the contract.  Thus, even accepting Defendants argument that Plaintiffs' recovery should be limited to $1.25 million, it is not equitable to permit the Defendant to receive the corresponding windfall.

For the reasons set forth above, with respect to their recovery pursuant to the rescission of the Purchase Agreement itself, Plaintiffs are entitled to receive the entirety of the purchase price, $1.674 million, and Defendant is entitled to receive a deed from Plaintiffs for the parcel, free of all liens, along with all other customary closing documents for a land-sale transaction of this sort, within 30 days from the date of this Court's Order granting rescission.[6]

E.   Closing Costs and Golf Club Costs

---

[6] The closing documentation shall include, but not be limited to, the following: (1) a special warranty or quit claim deed, at Defendant's option, from Plaintiffs to Defendant; (2) Certificates of Satisfaction, from BB&T and any other lien-holders; (3) Owner's Affidavit (addressing Foreign Investment in Real Property Tax Act ("FIRPTA"), environmental, document errors and omissions, and bankruptcy); (4) HUD-1 or other disbursement document; (5) Modification to Juno-Loudoun's Deed of Trust in favor of its lender, M&T Bank to include Plaintiffs' lot, if required; and (6) a customary title-insurance commitment.  (Defendant's Brief p. 8).

In addition to the purchase price, Plaintiffs seek to recover their closing costs in the amount of $38,170.95, which includes $20,000 for their golf club membership, $15,970.95 in settlement charges, and $2,200.00 in Homeowner's Association ("HOA") payments. (Plaintiff's Brief p. 6; Def. Ex. 2.) Defendant argues that Plaintiff is not entitled to recover these costs because they were not paid under the Purchase Agreement and the LLC funded these payments. (Defendant's Brief p. 12.) As an initial matter, granting Plaintiff recovery of these costs is in the Court's discretion pursuant to 15 U.S.C. § 1709(a).

First, with respect to the golf club membership fees, in their opening brief, Plaintiffs sought recovery of the $75,000.00 golf-club initiation fee paid by them at closing. (Plaintiff's Brief p. 6.) In their response, Plaintiffs withdrew this request, but maintain they are entitled to recover the $20,000.00 fee paid as part of their closing costs. (Plaintiff's Response p. 8.) Defendant's argument has merit. This Court granted rescission of the Purchase Agreement and requisite closing documents. Though the Purchase Agreement required membership in the golf club as a condition of Defendant's obligation to sell the lot to Plaintiffs, the golf club membership was pursuant to a separate contract, was personal to Plaintiffs, and neither appurtenant to ownership of the parcel at issue in this case nor transferable to successor

13

owners of the estate site.  (Def. Ex. 3 at p. 9.)  Moreover,
Keith Nahigian admitted in his deposition that the golf club
membership was purchased for use in client-relations by the LLC,
and that he so used the golf club on certain occasions.  (Def.
Ex. 8 at p. 5.)  As such, Plaintiff cannot recover the golf club
membership fee from Defendant in the course of returning the
parties to their *ex ante* positions relative to the Purchase
Agreement being rescinded.

Second, as to the $15,970.95 in settlement charges,
though these payments were necessary transaction costs, the
recipients were third-parties, not Defendant.  The $15,970.95
includes $7,500.00 in loan origination fees for the BB&T note,
$3,350.00 in title insurance to Fidelity National Title
Insurance Company, $75.00 in courier and delivery fees to
Monarch Title, Inc., $46.00 in recording fees, $1,249.95 in
county transfer taxes, and $3,750.00 in state taxes.  All of
these payments were made to third-parties.  These payments were
not part of the Purchase Agreement and were not received by
Defendant.  Closing costs are by their nature transaction costs,
matters outside the contract at issue but incident to its
execution, *i.e.*, the proverbial cost of doing business.  As
such, Plaintiff cannot recover them from Defendant in the course
of returning the parties to their *ex ante* positions relative to
the Purchase Agreement being rescinded.

14

Third, with respect to the HOA fees, the recipient was a third-party, not Defendant.  For the same reasons set forth above, Plaintiff cannot recover the HOA fees.

F.   Interest

ILFSDA does not specifically provide for pre-judgment interest, but section 1703(c) grants this Court discretion to award Plaintiff pre-judgment interest.  "[A]bsent a statutory mandate the award of pre-judgment interest is discretionary with the trial court." *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1030 (4th Cir. 1993).  The inquiry with respect to pre-judgment interest, then, is: first, whether the Court should award it; second, at what rate; and third, as of what date.

First, with respect to whether to award pre-judgment interest, Defendant argues that interest is inappropriate here, because Plaintiffs have had all the potential benefits of ownership of the property and the property was an investment for the LLC.  Plaintiffs argue, of course, that the Court should award pre-judgment interest, because Plaintiffs have been deprived the benefit of the funds at issue.  (Defendant's Brief p. 11; Plaintiff's Brief p. 8.)  Among other things, whether to grant an award of pre-judgment interest "should be a function of [] the need to fully compensate the wronged party for actual damages suffered." *Wickham Contracting Co., Inc. v. Local Union*

15

*No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831,
834-35 (2nd Cir. 1992).

Here, full compensation of the Plaintiffs requires an
award of pre-judgment interest.  Defendant has had use of
Plaintiffs' capital and acquired such use pursuant to a contract
that is now being rescinded.  Defendant argues that an award of
pre-judgment interest will be a form of monetary damages.
(Defendant's Brief p. 9.)  Rather than being a form of damages,
however, an award of pre-judgment interest will return to
Plaintiffs the value of the next-best alternative use of their
capital, *i.e.*, their opportunity cost of entering into the to
be-rescinded Purchase Agreement.  To restore Plaintiffs' to the
*status quo ex ante*, this Court will award pre-judgment interest
to compensate for that opportunity cost.

Second, with respect to the correct rate, "the rate of
pre-judgment interest for cases involving federal questions is a
matter left to the discretion of the district court."
*Quesinberry*, 987 F.2d at 1031 (citing *United States v. Dollar
Rent A Car Systems*, Inc., 712 F.2d 938, 940 (4th Cir.1983)).
Defendant argues the correct rate is the rate provided by 28
U.S.C. § 1961, and Plaintiff proposes the Virginia judgment rate
of six percent, pursuant to Va. Code Ann. § 6.1-330.54.
(Defendant's Brief p. 11; Plaintiff's Brief p. 8.)  "Federal law
controls the issuance of prejudgment interest awarded on federal

16

claims." *Fox v. Fox*, 167 F.3d 880, 884 (4th Cir. 1999) (*see also United States v. Dollar Rent A Car Sys., Inc.*, 712 F.2d 938, 939 (4th Cir. 1983)).  Moreover, "there is a strong federal interest in the uniformity of remedies available under a federal cause of action such as ILSFDA." *Plant*, 2010 WL 1039875, at *9. This Court, then, will not apply the Virginia judgment rate.

The federal rate proposed by Defendant, however, is not dispositive, as it provides for *post*-judgment interest, *i.e.*, the interest accrued *after* entry of a civil judgment. (*See* 28 U.S.C. § 1961 ("Interest shall be allowed *on any money judgment . . . on judgments recovered* in the courts . . . calculated *from the date of the entry of the judgment . . . .*") (emphasis added)).  In determining the applicable rate of interest, the Second Circuit has stated that "[a] plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Independent Bulk Transport, Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 27 (2nd Cir. 1982).  In the interest of uniformity of federal remedies, then, the applicable interest rate is the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which interest begins to accrue.  *See* 28 U.S.C. § 1961.

Third, with respect to the date from which pre-judgment interest should accrue, Defendant argues that because Plaintiffs have had full title and use of the property, interest should begin to accrue from the date on which this Court declares rescission to occur. (Defendant's Brief p. 10.)  In the alternative, Defendant argues that interest should begin to accrue from the date on which Plaintiffs first made their ILFSDA claim for rescission.  *Id*.  Plaintiffs argue that interest should begin to accrue from the closing date.  (Plaintiff's Brief p. 8.)  Using the date on which this Court declares rescission would defeat entirely the purpose of granting pre-judgment interest.  Defendant cites *Cox v. Shalala*, 112 F.3d 151 (4th Cir. 1997), for the proposition that pre-judgment interest should begin to accrue from the date of demand for payment and not before then.  *Cox* is inapposite here,[7] however, because the award of pre-judgment interest is based not on Defendant's failure to return payment once it was demanded, but because Defendant has had use of Plaintiffs' money it received pursuant to a contract that is now being rescinded, *i.e.*, pursuant to an

---

[7] In *Cox*, the Fourth Circuit held that federal law preempted North Carolina's Wrongful Death Act to the extent it directly conflicted with Medicare's secondary-payer provisions by limiting Medicare's right to recover medical expenses it paid on a decedent's behalf from that decedent's wrongful death settlement.  Because Medicare had a right to recover the medical expenses, decedent's heirs were then debtors of the United States.  The court held that the district court did not abuse its discretion when it calculated pre-judgment interest as of the date that Secretary of Health and Human Services filed her memorandum in support of a motion for summary judgment on her counterclaim in the case, which the district court found gave decedent's heirs sufficient notice that debt was due to Medicare.

agreement that is now undone from the beginning.  Because this
Court has awarded Plaintiffs pre-judgment interest so that they
can recover the opportunity cost of Defendant having had the use
of their money, interest will have accrued from the closing
date, July 6, 2007.  (Def. Ex. 1, 2.)

        For the reasons set forth above, with respect to pre-
judgment interest, Plaintiffs are entitled to receive the pre-
judgment interest on the amount of the purchase price that was
not paid with proceeds of the BB&T loan but with Plaintiffs' own
capital, namely $174,000.00.  The applicable rate is 4.99
percent, the weekly average one-year constant maturity Treasury
yield, as published by the Board of Governors of the Federal
Reserve System, for the calendar week preceding the date on
which interest begins to accrue, July 6, 2007,[8] and will be
computed daily and compounded annually from July 6, 2007, until
the date on which the rescission transaction order by this Court
is effected.  *See* 28 U.S.C. § 1961(a), (b).

        G.   Attorneys' Fees and Costs

        Plaintiffs have requested attorneys' fees and costs in
the amount of $168,237.50.  Under ILFSDA, this Court has
discretion in granting "reasonable amounts of attorneys' fees."
15 U.S.C. § 1709(c).  The party requesting fees bears the burden
of demonstrating the reasonableness of what it seeks to recover.

---

[8] That rate can be found at
http://www.federalreserve.gov/releases/h15/data/Weekly_Friday_/H15_TCMNOM_Y1.
txt.

*Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990); *Cook v. Andrews*, 7 F. Supp. 2d 733, 736 (E.D. Va. 1998).  "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174 (4th Cir. 1994).  The product of the reasonable fee and reasonable rate is referred to as the "lodestar amount." *See Daly v. Hill*, 790 F.2d 1071, 1076 n.2 (4th Cir. 1986).  In determining "what constitutes a 'reasonable' number of hours and rate . . . a district court's discretion should be guided by the following twelve factors" adopted from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243-44 (4th Cir. 2009) (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)).  Those *Johnson/Kimbrell* factors are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the

experience, reputation and ability of the attorney; (10) the
undesirability of the case within the legal community in which
the suit arose; (11) the nature and length of the professional
relationship between attorney and client; and (12) attorneys'
fees awards in similar cases.  *Id.*  The Court need not address
all twelve factors independently, because "such considerations
are usually subsumed within the initial calculation of hours
reasonably expended at a reasonable hourly rate."  *Freeman v.
Potter*, No. 7:04cv276, 2006 WL 2631722, at *2 (W.D. Va. 2006)
(citing *Hensley*, 461 U.S. at 434 n.9).

        "After determining the lodestar figure, the court then
should subtract fees for hours spent on unsuccessful claims
unrelated to successful ones . . . . [O]nce the court has
subtracted the fees incurred for unsuccessful, unrelated claims,
it then awards some percentage of the remaining amount,
depending on the degree of success enjoyed by the plaintiff."
*Robinson*, 560 F.3d at 244 (internal quotations and citations
omitted).  *Id.* (internal quotation marks and citation omitted).
Because the "degree of success obtained by the plaintiff is the
'most critical factor' in determining the reasonableness of a
fee award, the district court 'may simply reduce the award to
account for the limited success.'" *Lilienthal v. City of
Suffolk*, 322 F. Supp. 2d 667, 675 (E.D. Va. 2004) *(*quoting
*Hensley*, 461 U.S. at 436-37).  There is no "precise formula" for

making this reduction to the lodestar amount; however, the court may either "reduce the overall award" or "identify specific hours that should be eliminated." *Hensley*, 461 U.S. at 436-37. The attorneys' fee award decisions are within the discretion of the district court and should be reviewed for abuse of discretion. *See McDonnell v. Miller Oil Co.*, 134 F.3d 638, 640 (4th Cir. 1998). Within this framework, the Court will evaluate Plaintiffs' request for attorneys' fees and related costs and Defendant's objections thereto.

      i.    Reasonableness of the Number of Hours

The Court first must determine whether plaintiff met its burden of establishing the reasonableness of the number of hours and billing rate for which it seeks recovery. In support of its request, Plaintiff submitted affidavits of its lead counsel, J. Chapman Petersen, and attorney David Gogal, as well as its counsel's billing records for this case. (P. Ex. 2, 4, 5.) The Court notes that it was mindful of Plaintiff's duty to exercise billing judgment and paid careful attention to identify hours that appear excessive, redundant and unnecessary. *See Hensley*, 461 U.S. at 437 ("The applicant should exercise 'billing judgment' with respect to hours worked.").

With these considerations in mind, the Court will analyze the reasonableness of the hours under each of the *Johnson/Kimbrell's* factors.

        a.   First Factor: Time and Labor Expended

        The first *Johnson/Kimbrell's* factor relates to the
time and labor required in the case.  Plaintiffs submit that the
amount of time its counsel spent on this case was reasonable
based on the complexity of the case, the issues presented, and
the number of briefs filed.  (Plaintiff's Brief p. 12; P. Ex. 2.
¶ 8.)  According to the affidavit of Plaintiffs' lead counsel,
the total number of hours billed to this case by all time-
keepers was 626.05.  (P. Ex. 2. ¶ 8.)  Plaintiffs' counsel also
declined to bill Plaintiffs of 66.9 hours.  *Id*.  Though not
broken out by Plaintiffs, a review of counsel's "Detail Fee
Transaction File List" shows the total figure of 626.05 includes
297.50 hours for Mr. Petersen, 274.10 hours for his associate
Jason Zellman, 26.20 hours for his associate John Bazaz, and
25.05 hours for law clerks and staff.[9]  (P. Ex. 4.)  As noted,
Plaintiffs have voluntarily reduced the number of hours for
which they seek reimbursement, eliminating fees associated with
preparation and argument for the June 25, 2010 Motion to Compel
and July 2, 2010, Motion for Sanctions.

        In response, Defendant argues that much of Plaintiffs'
efforts in this case were devoted to unsuccessful claims, but
otherwise did not contest the number of hours billed.  The Court
will address this argument in in II.F.ii below, discussing a

---

[9] The 626.05 hours figure also includes, apparently, 3.20 hours billed by
certain of Mr. Petersen's law partners, the fee for which Plaintiffs appear
not to request here.

reduction for unsuccessful claims.  As noted, Plaintiffs have
voluntarily reduced the number of hours for which they seek
reimbursement, eliminating fees associated with preparation and
argument for the June 25, 2010 Motion to Compel and July 2,
2010, Motion for Sanctions.  The Court also endeavored to
carefully review the itemized billing record submitted in
support of Plaintiffs' motion, which lists the specific types of
work for which counsel billed their time.  The Court finds that
the time entries do not appear excessive, redundant and
unnecessary and no reduction is required under this factor.

         b.    <u>Second, Third, and Ninth Factors:</u>
<u>Novelty and Difficulty of the Questions</u>
<u>Raised, Skill Required to Properly</u>
<u>Perform the Legal Service Rendered, and</u>
<u>Experience, Reputation, and Ability of</u>
<u>the Attorney</u>

Plaintiffs argue that the claims presented in this
case addressed novel issues and required a unique skill set.
(Plaintiff's Brief p. 13.)  Defendant does not dispute this
factor.  The Court, however, finds that while the new cases were
decided during this action that affected the law applicable to
alleged ILFSDA violations, this litigation did not present any
particularly complex or novel questions of law or require a
unique skill set.  That said, counsel demonstrated that they had
the proper experiences, skills, and legal acumen required to
successfully present this case.

c.     Fourth Factor: Attorneys' Opportunity
       Costs in Pressing the Instant
       Litigation

Plaintiffs argue that acceptance of this case precluded their counsel from working on other matters. (Plaintiff's Brief p. 13.)  Plaintiffs do not identify any opportunity costs to counsel, however, and Defendant does not contest this factor.  Thus, this factor will not affect the Court's determination.

d.     Fifth Factor: Customary Fee for Like
       Work

Plaintiffs provided an affidavit from its lead counsel, Mr. Petersen, and from an outside attorney practicing in this locality, Mr. Gogal.  (P. Ex. 2, 5.)  Mr. Petersen charged $375.00 per hour, and his associate, Jason F. Zellman, charged $175.00 per hour.  (Plaintiff's Brief p. 12.; P. Ex. 2 ¶ 4.)  Additional work performed by another associate, John Bazaz, was billed at $250.00 per hour, and work done by law clerks and staff was charged at $100.00 to $125.00 per hour.  (P. Ex. 2 ¶ 4.)  Defendant does not dispute these rates and provides no contrary evidence.  The Court, however, will nonetheless address this factor.

The hourly rates for which the prevailing party requests reimbursement must be reasonable.  *Rum Creek Coal Sales, Inc.*, 31 F.3d at 175 (citing *Hensley*, 461 U.S. at 433). The determination of the reasonableness of given rates is a

"fact-intensive [one] and is best guided by what attorneys earn from paying clients for similar services in similar circumstances." *Id.* (*citing Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)).  To carry this burden, Plaintiffs can establish the market rate "through affidavits reciting the precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market." *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987) (citations omitted).  This evidence must be submitted "[i]n addition to the attorney's own affidavits." *Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir. 1990).

Messrs. Petersen and Gogal's affidavits state that each is familiar with the rates charged by attorneys in this market for this type of work and the rates are competitive and reasonable.  (P. Ex. 2 ¶ 12; 5 ¶ 3.)  "[M]erely relying upon an attorney's own affidavit is insufficient to establish an acceptable market rate for attorneys' fees under this factor." *U.S., ex rel. Ubl v. IIF Data Solutions*, No. 1:06cv641, 2010 WL 1726767, at *8 (E.D. Va. April 28, 2010).  With respect to Mr. Gogal's affidavit, "among the accepted types of evidence which are satisfactory to establish the prevailing market rates are

'affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community.'"   *Id.* (quoting *Robinson*, 560 F.3d at 245).   Mr. Gogal attests that he is familiar with the prevailing market rates in the Northern Virginia community for the work of this type, that he is familiar with Mr. Petersen and the other attorneys who worked on this case, their skills and reputation, and that he discussed the case with them and reviewed the filed pleadings.   (P. Ex. 5 ¶¶ 1, 5.)   Mr. Gogal states that he believes the rates charged by Plaintiffs' counsel and staff are reasonable and commensurate with the prevailing market rates in this community.   (P. Ex. ¶ 5.)

The Court's own inquiry into the reasonable of the fees is based on recent decisions of the Court.   In *IIF Data Solutions*, this Court reviewed two versions of the "Laffey Matrix,"[10] one published by the United States Attorney's Office for the District of Columbia[11] and one known as the "Adjusted Laffey Matrix," and a table of fees outlined in *Grissom v. The*

---

[10] The Laffey Matrix is used as a guideline for reasonable attorney fees in the Washington/Baltimore area.   *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. E. Sign Tech, LLC*, 2006 U.S. Dist. LEXIS 72345, at *7 (E.D. Va., Oct. 4, 2006) (using the *Laffey* matrix as evidence of reasonableness). The matrix is hosted on the website of the United States Attorney's Office for the District of Columbia.   *See* http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html. The rates are adjusted for cost of living and are based on rates found reasonable in *Laffey v. Nw. Airlines*, 746 F.2d 4, 24-25 (D.C. Cir. 1985), *overruled in part on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1524 (D.C. Cir. 1988).
[11] The Court will refer to this matrix as the "Unadjusted Laffey Matrix."

*Mills Corp.*, 549 F.3d 313 (4th Cir. 2008), which it dubbed the "Grissom Table." *IIF Data Solutions,* 2010 WL 1726767, at *8-9. "[T]he Laffey matrix is a useful starting point to determine fees, not a required referent." *Newport News Shipbuilding and Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 n.11 (4th Cir. 2009). The two Laffey matrices are set forth below:

| Unadjusted Laffey Matrix | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *Year* | 03-04 | 04-05 | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 |
| *Experience* | *Fees* | | | | | | | |
| 20+ years | $380 | $390 | $405 | $425 | $440 | $465 | $465 | $475 |
| 11-19 years | $335 | $345 | $360 | $375 | $390 | $410 | $410 | $420 |
| 8-10 years | $270 | $280 | $290 | $305 | $315 | $330 | $330 | $335 |
| 4-7 years | $220 | $225 | $235 | $245 | $255 | $270 | $270 | $275 |
| 1-3 years | $180 | $185 | $195 | $205 | $215 | $225 | $225 | $230 |
| Paralegals & Law Clerks | $105 | $110 | $115 | $120 | $125 | $130 | $130 | $135 |

| Adjusted Laffey Matrix | | | | | | |
|---|---|---|---|---|---|---|
| | *Experience* | | | | | |
| | Paralegal/Law Clerk | 1 to 3 Years | 4 to 7 Years | 8-10 Years | 11 -19 Years | 20 + Years |
| *Year* | *Fees* | | | | | |
| 6/01/09-5/31/10 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08-5/31/09 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | $130 | $239 | $293 | $423 | $476 | $574 |

The Fourth Circuit, in *Grissom*, looked to the Unadjusted Laffey Matrix in evaluating fees in the Northern Virginia area and, while recognizing its use as a starting point

in evaluating fees, adjusted the applicable market rates as indicated in the table provided below.  *Grissom*, 549 F.3d at 323.

| Grissom Table | | |
|---|---|---|
| *Title* | *Years Experience* | *Hourly Rate* |
| Partner | 18-19+ | $335.00-380.00 |
| Associate | 6-7 | $250.00 |
| Associate | 5-6 | $250.00 |
| Associate | 2-3 | $200.00 |
| Associate | 1 | $180.00 |

*See IIF Data Solutions*, 2010 WL 1726767, at *9.  The analysis set forth in *IIF Data Solutions* provides a useful benchmark for the present case.  Accordingly, the Court makes the following findings with respect to each attorney "bearing in mind each of these resources, but giving the greatest heed to the Fourth Circuit's guidance in *Grissom*."  *Id*.

With respect to Mr. Petersen, Plaintiffs seek fees in the amount of $375.00 per hour.  Mr. Petersen has 16 years experience practicing general civil litigation in Northern Virginia.  (P. Ex. ¶ 1.)  According to the Unadjusted Laffey Matrix, the hourly rate for an attorney with 16 years' experience is $420.00, while the Adjusted Laffey Matrix puts that figure at $569.00.  The Grissom Table, however, puts the rate for an attorney with 18 years experience at $335.00, below Plaintiffs' request.  Moreover, this Court in *IIF Data Solutions* awarded fees of $400.00 for counsel with over thirty years experience, and this Court has more recently found that $350.00

and $375.00 for counsel with 31 years of experience and $400.00 for counsel with 36 years experience was reasonable in light of the Grissom Table. *IIF Data Solutions*, 2010 WL 1726767, at *9; *BP Products North America, Inc. v. Stanley*, No. 1:09cv1147, 2010 WL 3473791, at *2 (E.D. Va. September 1, 2010). As such, and in consideration of the record before the Court, an hourly rate of $335.00 is appropriate for Mr. Petersen.

With respect to Mr. Zellman, Plaintiffs seek fees in the amount of $175.00 per hour. Mr. Zellman has two years experience practicing general civil litigation in Northern Virginia. (P. Ex. ¶ 11.) The two Laffey Matrixes and the Grissom table put the applicable rate for an attorney with Mr. Zellman's experience between $180.00 and $285.00 per hour. This Court awarded fees of $200.00 for a first-year associate in *IIF Data Solutions*. *IIF Data Solutions*, 2010 WL 1726767, at *9. In light of this, an hourly rate of $175.00 is appropriate for Mr. Zellman.

Next, as to Mr. Bazaz, Plaintiffs seek fees in the amount of $250.00 per hour. Mr. Bazaz has four years experience practicing general civil litigation in Northern Virginia. (P. Ex. ¶ 11.) The two Laffey Matrixes put the applicable rate for an attorney with Mr. Bazaz's experience between $275.00 and $349.00 per hour, and the Grissom Table puts the applicable rate between $200.00 and $250.00 for attorneys with two to three and

five to six years experience, respectively.   This Court awarded
a per-hour fee of $225.00 for an attorney with four years
experience.  *BP Products North America, Inc.*, 2010 WL 3473791,
at *2.  Given these figures, an hourly rate of $225.00 is
appropriate for Mr. Bazaz.

As to law clerks and staff fees, Plaintiffs seek fees
in the amount of $100.00 to $125.00 per hour.  The record does
specify an experience level for any staff fees.  The two Laffey
Matrixes put the applicable rate for paralegals and law clerks
between $135.00 and $155.00 per hour.  The Grissom Table is
silent as to staff and law clerks; given that the Unadjusted
Laffey Matrix rate for first year attorneys is $285.00 and the
Grissom Table puts it at $180.00, or 63 percent of the
Unadjusted Laffey Matrix, that same proportion may provide a
rough Grissom Table figure for paralegals and staff of roughly
$85.00.  This Court recently awarded a per-hour fee of $35.00
for a staff member whose experience and role were not specified.
*Id*.  In light of these figures, an hourly rate of $85.00 is
appropriate for law clerks and staff.

       e.   Sixth Factor and Seventh Factors:
           Attorney's Expectations at the Outset
           of the Litigation and Time Limitations
           Imposed by the Client of Circumstances

The Court need not consider the sixth and seventh
*Johnson* factors, because neither Plaintiffs nor Defendant
address them, and the Court agrees that neither is significant

31

to this case.  Thus, these factors will not affect the Court's determination.

        f.   <u>Eighth Factor: Amount in Controversy and the Results Obtained</u>

      As noted above, "the degree of success obtained by the plaintiff is the 'most critical factor' in determining the reasonableness of a fee award." *Lilienthal*, 322 F. Supp. 2d at 675 (quoting *Hensley*, 461 U.S. at 436-437).  Plaintiffs' Amended Complaint against Defendant and Ritz-Carlton Hotel Company, LLC ("Ritz"), sought Count I for fraud, Count II for ILFSDA violations, and Count III for violations of the Virginia Consumer Protection Act (the "VCPA").  [Dkt. 28.]  Plaintiffs sought rescission of the Purchase Agreement, compensatory damages in the amount of $2.5 million, trebled to $7.5 million under the VCPA, and punitive damages in the amount of $350,000. *Id*.  This Court granted summary judgment in favor of Ritz, so Plaintiffs recovered nothing on their claims related to it. [Dkt. 166.]  As to Defendant, this Court granted summary judgment in its favor as to the fraud and VCPA claims, so Plaintiff did not recover damages.  *Id*.  Plaintiffs were successful, however, in their ILFSDA claim against Defendant, and have been granted rescission of the Purchase Agreement.  The Court will address below in II.F.ii the affect of Plaintiffs' unsuccessful claims on the lodestar figure.

g.   Factors Ten, Eleven, and Twelve:
Undesirability of the Case, Nature and
Length of the Professional Relationship
Between Attorney and Client, and
Attorneys' Fees Awards in Similar Cases

Neither party presented any evidence concerning these three *Johnson/Kimbrell*'s factors.  Thus, the Court need not and does not consider these factors in its analysis to either increase or decrease the attorneys' fees amount sought by Plaintiffs.

ii.   Reduction for Unsuccessful Claims

As noted above, Defendant argues that much of Plaintiffs efforts in this case were devoted to unsuccessful claims against Defendant and Ritz, and the Court should reduce the fee award accordingly.  In determining whether the lodestar figure should be reduced for unsuccessful claims, this Court must examine "whether the now unsuccessful claims against [Defendant and Ritz] were sufficiently unrelated to [the successful claim against Defendant] that the hours expended in pursuit of the former claims must be excluded in the fee award calculation."  *Buffington v. Baltimore County, Md.*, 913 F.2d 113, 128 (4th Cir. 1990); *see also Rucker v. Sheehy Alexandria, Inc.*, 255 F. Supp. 2d 562 (E.D. Va. 2003) (reducing fee award for time spent on unsuccessful claims).  "In *Hensley*, the Supreme Court admonished district courts that where a plaintiff brings in a single lawsuit 'distinctly different claims that are

33

based on different facts and legal theories,' work on
unsuccessful claims cannot be thought to have contributed to the
ultimate result and must be excluded from the fee award." *Id.*
(quoting *Hensley*, 461 U.S. at 434-35).

In the instant case, the unsuccessful claims were
fraud and VCPA claims against Defendant and Ritz and ILFSDA
claims against Ritz.  Defendant argues that the fraud and ILFSDA
claims are distinctly different claims that are based on
different facts and legal theories.  (Defendants Opp. p. 7-8.)
Defendant points out that a sizeable portion of the requested
fee was accumulated before Plaintiffs amended their complaint to
add the ILFSDA claims.  *Id*.  With respect to the legal claims,
Defendant's argument has merit and is uncontested by Plaintiffs.
Plaintiffs' successful ILFSDA claim was based on faulty
disclosure and not on fraud, and its legal elements were
different from those in its fraud and VCPA claims.  The factual
basis of all Plaintiffs' claims, however, was the 2007 Purchase
Agreement and corresponding transaction, and the research,
evidence, and discovery all revolved around that transaction and
the parties to it.  Also, significantly, had Plaintiffs not
prevailed in motions prior to amending its complaint to add the
ultimately successful ILFSDA claim, Plaintiffs would not have
obtained the result they have.  As the Supreme Court stated in

*Hensley*, in cases involving different legal claims and different parties,

> [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley*, 461 U.S. at 435. The overall relief obtained by Plaintiffs is significant, but Defendant is correct that the number of hours taken into account in computing the lodestar figure should be reduced to reflect the unsuccessful claims.

Plaintiffs' request does not itemize the amounts spent on the unsuccessful claims as opposed to the successful claim. Plaintiffs state that approximately 30 percent of their counsels' work was solely focused on Ritz. (Plaintiff's Brief p. 16.) Defendant, using the number of pages in this Court's August 23, 2010, Memorandum Opinion devoted to determining whether Ritz was a "developer" under ILFSDA and the amount of pages devoted to Ritz in certain of Plaintiffs' briefing, proposes that a 50 percent reduction is insufficient. (Defendant's Opp. p. 8.) This Court finds that Plaintiffs' proposed 30 percent reduction does not at all account for their unsuccessful fraud and VCPA claims against Defendant. Also, the disparity in dollar amounts between what Plaintiff sought and

what Plaintiff received is significant.  Ultimately, however,

Plaintiffs obtained an excellent result, so the Court finds that

a reduction to the lodestar figure of 40 percent is reasonable.

      iii.     <u>Lodestar and Reduction</u>

      "Guided by [the *Johnson/Kimbrell*] factors, the court

should determine how many hours were reasonably spent on the

litigation and the rate at which that work should be

compensated."  *Toolchex, Inc. v. Trainor*, No. 08-cv-236, 2009 WL

2244486, at *6 (E.D. Va. July 24, 2009).  "On that basis, the

court can determine a 'lodestar figure,' which may be adjusted

further." *Id*.  The following table summarizes the hours billed,

which the Court has found reasonable, and the reasonable rates

as addressed above.

| Name | Hours | Reasonable Rate | Total |
|------|-------|-----------------|-------|
| Mr. Petersen | 297.50 | $325.00 | $99,662.50 |
| Mr. Bazaz | 26.20 | $225.00 | $5,895.00 |
| Mr. Zellman | 274.10 | $175.00 | $47,967.50 |
| Staff and Law Clerks | 25.05 | $85.00 | $2,129.25 |
| *Lodestar* | | | $155,654.25 |

The Court will further reduce this figure by 40 percent, to

arrive at an award of attorneys in the amount of $93,392.55.

      iv.     <u>Costs</u>

      Plaintiffs also seek to recover $2,000.00 in costs

paid as a fee to their independent appraiser.  Because recovery

of an appraiser's fee is expressly provided in section 1703(c),

the Court finds that Plaintiffs are entitled to recover the

$2,000.00 in appraisal costs.  Plaintiffs will arrange for the payment of this amount to the appraiser.

### III.  Conclusion

For these reasons, the Court will grant in part and deny in part Plaintiffs' Motion for Pre-Judgment Interest and Costs and Attorneys' Fees.

An appropriate Order will issue.


/s/
November 5, 2010                   James C. Cacheris
Alexandria, Virginia       UNITED STATES DISTRICT COURT JUDGE